# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CODY K. BAUER**, | Case No. 3:17-cv-510-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **OLD DOMINION FREIGHT LINE, INC.**, | |
| Defendant. | |

Stephen L. Brischetto and Dezi Rae Robb, LAW OFFICES OF STEPHEN L. BRISCHETTO, 621 SW Morrison Street, Suite 1025, Portland, OR 97205; and Matthew C. Ellis, LAW OFFICE OF MATTHEW C. ELLIS, 621 SW Morrison Street, Suite 1025, Portland, OR 97205. Of Attorneys for Plaintiff.

Elizabeth A. Falcone, Jennifer A. Nelson, and Kelly S. Riggs, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, 222 SW Columbia Street, Suite 1500, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Cody Bauer ("Bauer") brings this lawsuit against his former employer,

Defendant Old Dominion Freight Line, Inc. ("Old Dominion"). Among other things, Bauer

alleges that Old Dominion wrongfully discharged him from employment for refusing to operate a

vehicle when doing so would violate a regulation, standard, or order of the United States related

to commercial vehicle safety, health, or security or for refusing to operate a vehicle when the

employee reasonably apprehended serious injury to the employee or the public because of the vehicle's hazardous safety or security condition, in violation of 49 U.S.C. § 31105(a)(1)(B). Bauer also alleges that Old Dominion retaliated against Bauer in violation of Oregon law for whistleblowing, making a wage claim, and opposing unlawful employment practices. Old Dominion moves for summary judgment against all of Bauer's claims, and Bauer cross-moves for partial summary judgment on his claims under federal law. Old Dominion also asserts several evidentiary objections to certain statements and other matters offered by Bauer.

On December 13, 2018, United States Magistrate Judge Stacie F. Beckerman issued a thoughtful and well-explained Findings and Recommendation ("F&R"). Magistrate Judge Beckerman recommended that Old Dominion's Motion for Summary Judgment be granted in part and denied in part and that Bauer's motion for partial summary judgment be denied. For the reasons that follow, the court ADOPTS Magistrate Judge Beckerman's F&R in all respects except as it pertains to Bauer's claim under 49 U.S.C. § 31105(a)(1)(B)(ii) and his claims for punitive damages under state and federal law.

## STANDARDS

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objections to a magistrate judge's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United*

*States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review *de novo* magistrate judge's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate judge's recommendations for "clear error on the face of the record."

Bauer and Old Dominion both timely filed objections, to which each side responded. Old Dominion objects to Magistrate Judge Beckerman's recommendation that the Court overrule Old Dominion's objections to certain paragraphs of the Declarations of Cody Bauer and Matthew C. Ellis and deny Old Dominion summary judgment against Bauer's retaliation claims under Or. Rev. Stat. §§ 659A.199, 653.060, and 652.355.[1] Bauer objects to Magistrate Judge Beckerman's recommendation that the Court grant summary judgment against Bauer's retaliation claim under Or. Rev. Stat. § 659A.030(1)(f), Bauer's request for punitive damages, Bauer's federal claim for violation of hours of service regulations, and Bauer's federal claim for violation of 49 U.S.C. § 31105(a)(1)(B)(ii) alleging that he refused to drive based on a reasonable apprehension of serious injury due to the vehicle's hazardous safety condition.

## BACKGROUND

In August 2014, Old Dominion hired Bauer as a pickup and delivery ("P&D") driver. As a P&D driver, Bauer's job was to pick up and deliver goods between customers and Old Dominion's Portland Service Center. Old Dominion gave Bauer a handbook that contained Old

---

[1] Old Dominion did not object to the portions of the Findings and Recommendation denying its motion for summary judgment as to Bauer's federal claim under 49 U.S.C. § 31105(a)(1)(B)(i) and 49 C.F.R. § 392.14.

Dominion's policies regarding his employment, including Old Dominion's hours of service policies. Old Dominion policy instructed drivers not to drive if they have been on duty for more than 14 hours. Bauer would receive an assignment from one of Old Dominion's dispatchers to pick up and deliver goods to and from customers. Bauer primarily reported to dispatchers Rodney Classen and Michael Christie, who in turn reported to P&D Operations Manager Steve Sutton, Assistant Service Center Manager Kelly Stillwell, and Service Center manager Jeff Lorenzini. Malena Winborne was the Service Center's Human Resources Manager. Lorenzini, his supervisor Scott Goodrich, and the human resources department had the ability to decide whether to terminate a P&D driver's employment.

In the fall of 2014, shortly after Bauer started working for Old Dominion, he began to notice that his paycheck reflected that he had been docked 30 minutes of pay for his unpaid lunch break, even on days when he had been too busy to take a lunch break. On some days, Bauer was not able to take a meal break and worked for twelve hours straight. Bauer first began to raise the issue of his meal breaks with Sutton, Winborne, and his dispatchers. After Bauer asked Sutton about Old Dominion's meal break policy, Sutton told Bauer, "You take lunches when you can." Bauer estimates that he made approximately ten complaints about his meal breaks between November 2014 and February 2016. When his concerns went unaddressed, he eventually brought his complaints up the chain of command, to Lorenzini, Goodrich, Tom Lilywhite (Human Resources Manager for the Northwest Region), and Chris Brooks (Vice President of Human Resources).

On January 22, 2016, Bauer injured his back at work. After Bauer returned to work, he asked Sutton for a workers' compensation form, but Sutton told him it was not necessary and refused to give him the form. Bauer contends that Sutton then assigned Bauer to a more difficult

and physically demanding route, which he was not able to complete in the allotted time. As a result of not being able to complete his route in time, Bauer received a corrective interview.

Bauer also had complaints about Old Dominion's "on-call" policy. Drivers who were "on call" were required to call in periodically throughout the day and see if they were needed to perform work, but weren't paid for the time they spent waiting to be called to work. Bauer also believed that he was being placed "on-call" more than other employees. On February 4, 2016, Bauer spoke with Lorenzini about Sutton putting him "on-call" all the time and not letting him fill out a workers' compensation form. Bauer "warned" Lorenzini that if these issues were not resolved, he would file a complaint with the Oregon Bureau of Labor and Industries ("BOLI"). After this meeting, Lorenzini announced changes to Old Dominion's "on-call" policy. From that day forward, drivers would be given a specific time to call in, and if a driver was not called in by this time, they would be free for the rest of the day.

Bauer received two more corrective interviews in February 2016. Bauer met with Stillwell shortly afterwards and explained that his routes were so busy that it was difficult for him to take a lunch break or even complete the assigned task. It was after this meeting that Bauer contacted BOLI and complained about Old Dominion's meal break policy.

In mid-March, Bauer met with Lorenzini and Winbourne to complain about Old Dominion's meal-break policy, which Bauer contended resulted in him not getting his legally-mandated lunch breaks. Winbourne and Lorenzini told Bauer that Old Dominion had changed its meal-break policy and Old Dominion was no longer automatically deducting 30 minutes of work from employees who had been too busy to take their lunch breaks that day. On March 23, 2016, Old Dominion began sending lunch break reminders to P&D drivers. The next day, Sutton met with P&D drivers and informed them that they were required to take lunch breaks between the

third and sixth hour of work and that they should call the dispatch center if they were unable to do so. Bauer started taking regular lunch breaks after March 23, 2016, and was not placed "on call" again until May 10, 2016.

On May 10, 2016, Bauer was scheduled to be "on call" but did not receive a specified time to call in that day. He decided to work part of the morning at his family's restaurant until he heard from Old Dominion. He then received a call from Sutton, who told him to report to work. Bauer responded that he would need first to go home and change his clothes, but Sutton told him not to bother coming in. On May 19, 2016, Bauer received a final written warning that claimed that Bauer had told Sutton that he would be "unable to work." Lillywhite and Goodrich knew that Bauer had received a final written warning. On May 23, 2016, Bauer filed a formal complaint with BOLI, alleging that he had been retaliated against for using the worker's compensation system and for whistleblowing about meal breaks and "on-call" policies.

On December 14, 2016, weather forecasts predicted that a snowstorm would hit the Portland metropolitan area. At 3:00 p.m. that afternoon, Old Dominion dispatcher Michael Christie called Bauer and asked him to pick up goods from a customer near Salem, Oregon, and deliver them to the Portland Service Center. Bauer asked Christie if he was aware of the forecasted snowstorm and told Christie that he believed making the trip would create a safety risk. Christie assured Bauer that "everything would be fine." Bauer accepted the dispatch and embarked according to Christie's instructions.

Bauer drove to the customer's site near Salem and picked up the goods without incident. On his return from the Salem area to Portland, however, Bauer encountered difficult weather and road conditions. By the time Bauer reached Tualatin, conditions had severely worsened. The sun had set, visibility was poor, and the roads were icy and clogged with traffic. At about 9:00 p.m.,

Bauer had been on duty for almost 14 hours. He pulled his truck over and called Old Dominion. Bauer received no answer. He searched for nearby hotels but found no vacancies. Finally, he arranged to stay with a friend nearby and wait overnight until weather and road conditions had improved. Driving to his friend's house required Bauer to depart from his pre-approved route.

Shortly after 9:00 p.m., Bauer spoke with Christie and told him that Bauer was at a friend's house. Christie asked Bauer to return to the Portland Service Center and stated that Bauer was required to return, even if it meant driving more than 14 hours. Bauer disagreed with Christie's order to return to the Portland Service Center. Christie called Stillwell and then called Bauer back. Christie told Bauer to "go ahead and lay over" for the night but to return to the Portland Service Center "as soon as [his] time starts" in the morning.

In the morning of December 15, 2016, Lorenzini spoke with Goodrich, Lillywhite, and Brooks. They discussed the events of the previous day relating to Bauer. They all agreed that Bauer's decision to drive his truck off his scheduled route to a friend's house without first getting approval from Old Dominion's dispatcher was a violation of Old Dominion's policy. They informed Bauer that they had decided to terminate his employment.

## DISCUSSION

After a *de novo* review of those portions of Magistrate Judge Beckerman's F&R to which the parties objected, the Court concludes that Judge Beckerman's reasoning is thorough and sound as to each of the recommendations, save for the recommendations that the Court grant summary judgment on Bauer's claim under 49 U.S.C. § 31105(a)(1)(B)(ii) and on Bauer's state and federal punitive damages claims. Magistrate Judge Beckerman properly applied the rules of evidence at the summary judgment stage and correctly applied Oregon law to Bauer's state law retaliation claims.

**A. State Law Employment Claims**

Bauer challenges various adverse employment actions, including his negative performance evaluations and his termination. There is sufficient evidence to create a triable issue on retaliation for Bauer's claims under Or. Rev. Stat. 659A.199, 653.060, and 652.355. Old Dominion fired Bauer only seven months after he filed his formal complaint with BOLI. *See Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). Seven months is not, as Old Dominion argues, too long a time to create a reasonable inference of causation. "For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable . . . [o]r they may wait until they think the lapse of time disguises their true motivation." *Id.* at 978. A reasonable jury could conclude that Bauer's refusal to follow dispatch's order to continue driving on the night of December 14th provided the opportune moment to terminate him in an attempt to disguise a retaliatory motive.

Magistrate Judge Beckerman recommended that the Court grant summary judgment on Bauer's claim under Or. Rev. Stat. § 659A.030(1)(f) and (g). Bauer argues that, because Section 659A.030(1)(f) prohibits "any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter," it provides a cause of action for his claim that he was retaliated against for whistleblowing about violations of state and federal law. But Or. Rev. Stat. § 659A.030(1) describes "an unlawful employment practice" with regards to discrimination based on a protected status, such as race, color, religion, sex, sexual orientation, marital status, age, or disability. At least one court in this District has interpreted Or. Rev. Stat. § 659A.030(1)(f) to protect only against discrimination or retaliation based on a protected status. *See Sereno-Morales v. Cascade Food Inc.*, 819 F. Supp. 2d 1148, 1154 (D. Or. 2011). Additionally, Bauer points to Or. Rev. Stat. § 659A.199 and its

prohibition of retaliation for whistleblowing on violations of state or federal law as defining "an unlawful employment practice" under Chapter 659A of Oregon law, and he argues that Section 659A.030(f) thus prohibits violations of Section 659A.199. But Section 659A.199 provides its own cause of action for whistleblower retaliation, and Bauer also brings these claims under Section 659A.199. Therefore, if 659A.030(1)(f) provided a cause of action for violations of Section 659A.199, it would be redundant and unnecessary. This further compels the Court's conclusion that 659A.030(1)(f) protects against discrimination based on a protected class and does not also encompass prohibitions on retaliation for whistleblowing for reporting a violation of state or federal law contained in Section 659A.199.

Magistrate Judge Beckerman correctly concluded that 49 C.F.R. § 395.1(o) applies to Bauer and that he has offered no evidence to show an actual violation of 49 C.F.R. § 395.3(a)(2) would have occurred had he continued to drive on the night of December 14, 2016. In the F&R, the Magistrate Judge recommended that the Court grant summary judgment in favor of Old Dominion against Bauer's claim relating to hours of service on the ground that "Bauer has offered no evidence that continuing to drive for more than 14 hours on December 14, 2016 would have resulted in an actual violation of § 395.3(a)(2)[.]" ECF 136 at 25. If Bauer had continued to drive for not only more than 14 hours, but also more than 16 hours, an actual violation of federal regulations might have occurred. At the time he stopped driving on the evening of December 14th, Bauer had a little more than two hours of driving time left before reaching his 16-hour limit. Bauer, however, has offered no evidence to show that it would have *necessarily* taken more than two hours to drive from Tualatin to the Portland Service Center or that Old Dominion contemplated or expected that the drive would take more than two hours. Evidence that other drivers, in other locations throughout the metropolitan area, ended up driving

for more than 16 hours on December 14th is not relevant to whether Bauer would not have been able to drive from Tualatin to the Portland Service Center before his 16-hour limit expired.

Having briefly addressed some of the parties' objections to the F&R, the Court turns next to Bauer's claim under 49 U.S.C. § 31105(a)(1)(B)(ii) and Bauer's state and federal punitive damages claims.

## B. Surface Transportation Assistance Act

The Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105, prohibits a person from discharging an employee "because . . . the employee refuses to operate a vehicle because . . . the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition." *See* 49 U.S.C. § 31105(a)(1)(B)(ii). "Under paragraph (1)(B)(ii) of this subsection, an employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting the employee would conclude that the hazardous safety or security condition establishes a real danger of accident, injury, or serious impairment to health. To qualify for protection, the employee must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition." *Id.* at § 31105(a)(2).

Bauer argues that the text of the statute is ambiguous as to what constitutes "the vehicle's hazardous safety or security condition" and that the Court should accord deference to the Department of Labor's ("DOL") interpretation of the statute. The DOL, through its Administrative Review Board ("ARB"), has consistently interpreted subsection (B)(ii) to include refusals to drive in hazardous weather, when the driver has a reasonable apprehension that driving the vehicle in the weather conditions could pose a safety risk to the driver or the public. *See Treur v. Magnum Express, Inc.*, ARB Case No. 15-001, 2016 WL 4184207, at *6 (Dep't of Labor Admin. Rev. Bd. July 28, 2016); *Fink v. R&L Transfer, Inc.*, ARB Case No. 13-018, 2014

WL 1314284, at *2-3 (Dep't of Labor Admin. Rev. Bd. Mar. 19, 2014); *Eash v. Roadway Express, Inc.*, ARB Case Nos. 02-008; 02-064, 2003 WL 21488363, at *6 (Dep't of Labor Admin. Rev. Bd. June 27, 2003).

The Court reviews DOL's interpretation of the statute under the two-step framework of *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* framework, the Court first must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. But, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If the agency's interpretation of the statute is a reasonable one, "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

## 1.  Chevron Step Zero

Before engaging in Chevron's two-step process, a court must first determine whether "the agency interpretation at issue is one that may even be accorded *Chevron* deference." *Walker Macy LLC v. U.S. Citizenship & Immigration Servs.*, 243 F. Supp. 3d 1156, 1166 (D. Or. 2017). This step is often called "step zero." *Id.* An "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication . . . ." *Id.* at 227. *Chevron*

deference may be given to the DOL's legal interpretation of the STAA "because Congress has explicitly delegated to the Secretary of Labor authority to enforce the whistleblower provisions of the STAA by formal adjudication, and the Secretary has delegated that enforcement authority to the ARB." *TransAm Trucking, Inc. v. Admin. Review Bd.*, *U.S. Dep't of Labor*, 833 F.3d 1206, 1210 (10th Cir. 2016) (internal citations omitted). Accordingly, the ARB's decisions are the type of authority that may be accorded deference under *Chevron* and thus meet the requirements of *Chevron* step zero.

### 2. Chevron Step One

The Court next determines whether the text of the statute is ambiguous or silent with respect to the precise question at issue. The precise question at issue is whether hazardous weather conditions could create "the vehicle's hazardous safety or security condition." 49 U.S.C. § 31105(a)(1)(B)(ii). Bauer argues that the statutory text is ambiguous—the statute could describe either the condition of the vehicle itself or the condition that the vehicle finds itself in. Furthermore, Bauer points out that the condition of the vehicle and the vehicle's conditions are often interrelated. An icy road reduces a vehicle's ability to stop or turn, therefore affecting the condition of the vehicle on the road.

Old Dominion argues that the statute's text is clear and unambiguous and covers only a refusal to drive faulty equipment. Old Dominion argues that subsection (B)(ii) must be read in conjunction with subsection (a)(2), thus rendering the statutory meaning clear. Subsection (a)(2) requires that, in order to qualify for protection, "the employee must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition." *Id.* § 31105(a)(2). Because weather conditions are not something that the employer can correct, Old Dominion argues, weather conditions cannot create a hazardous condition under subsection (B)(ii).

The Court agrees with Bauer that the statue is ambiguous. "[T]he vehicle's hazardous safety or security condition" could refer to the condition of the vehicle's equipment or the condition that the vehicle finds itself in. *See id.* § 31105(a)(1)(B)(ii). Furthermore, the Court finds that the condition of the vehicle is often a function of the vehicle's circumstances. Driving in hazardous weather makes a vehicle unsafe, even when the vehicle has no faulty equipment. For example, a vehicle may lose the ability to stop quickly due to faulty brake pads or due to an icy road. In both scenarios, "the vehicle's hazardous safety . . . condition" is the vehicle's inability to stop. Weather conditions, thus, can make driving unsafe precisely because of their effect on condition of the vehicle.

Other courts have accepted that this statutory text is ambiguous insofar as it does not limit the "hazardous safety condition" to the condition of the vehicle's equipment but could also include external factors that would render operation of the vehicle unsafe. *See Yellow Freight Sys., Inc. v. Reich*, 38 F.3d 76, 82 (2d Cir. 1994) (finding DOL's interpretation of older version of subsection (1)(B)(ii) to include a refusal to drive in hazardous weather conditions was reasonable); *see also TransFleet Enterprises, Inc. v. Boone*, 987 F.2d 1000, 1004 (4th Cir. 1992) (including "driver fatigue" as a hazardous safety condition, the "reasonable apprehension" of which can justify a driver's decision to refuse to operate the vehicle). The statutory text, therefore, is ambiguous and does not clearly eliminate weather as a potential cause of a vehicle's hazardous safety condition.

Furthermore, subsection (a)(2) makes reference to "the hazardous safety or security condition" without language limiting the "condition" to faulty equipment. *See* 49 U.S.C. § 31105(a)(2) ("Under paragraph (1)(B)(ii) of this subsection, an employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting

the employee would conclude that the hazardous safety or security condition establishes a real danger of accident, injury, or serious impairment to health."). Although weather itself cannot be corrected by an employer, the conditions in which a driver must proceed could be corrected by the employer, simply by allowing the driver to wait until the weather conditions have improved. If the vehicle's hazardous safety condition is caused by the weather conditions that the vehicle would be required to drive through, waiting until the bad weather passes and the weather has improved would be a simple way to correct the unsafe condition. Further, some weather-related causes of a vehicle's unsafe condition could potentially be corrected by, for example, putting chains on the vehicle's tires.

When read in the context of the statute as a whole, what qualifies as a vehicle's hazardous safety or security condition is ambiguous and does not clearly mandate a reading limited to the vehicle's equipment, independent of any external factors that might render the vehicle unsafe. Accordingly, under step one of *Chevron*, the Court finds that the statutory text is ambiguous or silent on the issue of what constitutes a vehicle's hazardous safety or security condition.

### 3. Chevron Step Two

Under *Chevron* step two, the Court looks to the agency's interpretation of the statute to determine if it is reasonable. The ARB has, since at least 1987,[2] interpreted subsection (B)(ii) the STAA to include protections for drivers who refuse to operate a vehicle because they have a reasonable apprehension of serious injury to the employee or the public due to hazardous weather conditions. *See Treur*, 2016 WL 4184207, at *7 (discussing *Robinson v. Duff Truck*

---

[2] An earlier version of the statute contained slightly different language, but "the language is very similar and both versions contain an 'actual violation' clause and a 'reasonable apprehension clause.'" *See Treur*, 2016 WL 4184207, at *7 n.30 (quoting statutory text from 1987).

*Line, Inc.*, 1986-STA-3 (Sec'y, March 6, 1987), *aff'd sub nom. Duff Truck Line, Inc. v. Brock*, 848 F.2d 189 (table) (6th Cir. 1988)); *Eash*, 2003 WL 21488363, at *6.

The DOL interprets subsection (B)(ii) to include hazardous weather conditions because, "[c]ertainly, where driving is hazardous as a result of weather conditions, the equipment becomes unsafe on the road." *Treur*, 2016 WL 4184207, at *6 n.26 (quoting *Robinson*, No. 1986-STA-003, slip op. at 3). "The language at section 31105(a)(1)(B)(ii) ('reasonable apprehension') has been interpreted by the Department of Labor as encompassing refusals to drive in hazardous weather conditions[.]" *Id.* at *6. Large vehicles like trucks and trailers can pose particular dangers to drivers and the public on icy roads or in high winds. *See Fink*, 2014 WL 1314284, at *2. Hazardous weather conditions like ice and wind can cause vehicles to "jackknif[e] on ice and [cause] the 'crack the whip' effect in high winds." *Id.* Therefore, the DOL interprets subsection (B)(ii) to provide protection when "the Complainant had a reasonable apprehension of serious injury to himself or the public because of the unsafe driving conditions" caused, for example, by snow or freezing rain. *Eash*, 2003 WL 21488363, at *6; *see Fink*, 2014 WL 1314284, at *2.

The DOL's interpretation of the statute also takes into account the requirement in subsection (a)(2) that a driver "must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition." 49 U.S.C. § 31105(a)(2). "When a driver notifies an employer that he or she is refusing to drive because of current or forecasted hazardous weather, that notification serves as seeking correction under the statute." *Treur*, 2016 WL 4184207, at *7 n.29.

This interpretation of subsection (B)(ii) also is reasonable when read in conjunction with subsection (B)(i). Subsection (B)(ii) is often called the "reasonable apprehension" prong of

Subsection B. Subsection (B)(i), on the other hand, is referred to as the "actual violation" prong, because in order to be protected from retaliation for refusing to operate a vehicle under subsection (B)(i), "the operation of the vehicle" must "violate[] a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security." 49 U.S.C. § 31105(a)(1)(B)(i).[3] "In sum, while § 31105(a)(1)(B)(i) deals with conditions as they actually exist, § 31105(a)(1)(B)(ii) deals with conditions as a reasonable person would believe them to be." *Eash*, 2003 WL 21488363, at *5.

The DOL has long distinguished these two prongs, not by the conditions that a vehicle must face in order to qualify for protection, but by the difference between conditions that are actually unsafe and conditions that a reasonable person would believe to be unsafe. A violation of subsection (B)(i) "requires a complainant to establish that the condition of the vehicle or of the roads he would drive on was actually unsafe," *Eash*, 2003 WL 21488363, at *5, but "an employee need not prove the existence of an actual safety defect in order for his or her refusal [to drive] to receive protection" under subsection (B)(ii), *Yellow Freight Sys.*, 38 F.3d at 82. "Congress recognized that employees in the transportation industry are often best able to detect safety violations," so it is reasonable that Congress would include a statutory provision protecting employees who, under their best professional judgment, have a reasonable apprehension that what they are being asked to do would be unsafe. *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 258 (1987) (Opinion of Marshall, J.).

---

[3] Section 392.14 of the regulations specifically deals with hazardous weather conditions and requires that "[i]f conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued and shall not be resumed until the commercial motor vehicle can be safely operated." 49 C.F.R. § 392.14. Drivers are protected under 49 U.S.C. § 31105(a)(1)(B)(i) if they refuse to continue to drive because driving would result in an actual violation of 49 C.F.R. § 392.14.

Thus, in order to qualify for protection under the STAA, a driver need not continue driving to confirm that conditions are in fact dangerously unsafe. Under the DOL's interpretation of the statute, drivers are protected from retaliation when they refuse to operate a vehicle either because doing so would violate a safety regulation or because they hold a reasonable apprehension of serious injury due to unsafe conditions. The reasonable apprehension prong of the statute is necessary to protect drivers who have both a subjective and an objectively reasonable apprehension that the operation of the vehicle would pose a risk of serious injury, regardless of whether the actual conditions are in fact so severe as to violate one of DOL's safety regulations. [4] This ensures that "it is not complainant's burden to prove that there was *no possibility that he could safely drive*—a complainant's burden based on a refusal under (a)(1)(B)(ii) is simply to show that he had a 'reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition.'" *Treur*, 2016 WL 4184207, at *9 (emphasis in original).[5] By focusing the inquiry on what the employee knew and the circumstances confronting the employee at the time of his decision-making, employees who exercise reasonable caution that is later not borne out by subsequent events may not be subjected to retaliation.

---

[4] The F&R noted that a reasonable jury could conclude that the road conditions were not sufficiently dangerous to constitute an actual violation of DOL safety regulations, and therefore denied Bauer's motion for summary judgment. Under the reasonable apprehension prong, a jury could find for Bauer even if it concludes that the road conditions were not so severe as to actually violate 49 C.F.R. § 392.14, so long as Bauer actually had an apprehension that the road conditions were unsafe and his apprehension was objectively reasonable.

[5] Interpreting the reasonable apprehension prong to include protections for drivers who refuse to drive in a hazardous or unsafe condition unrelated to the equipment of the vehicle also extends protections to drivers who face a situation unforeseen by any of DOL's safety regulations under subsection (B)(i), but which the driver still reasonably anticipates will pose a serious safety risk.

Accordingly, the Court defers to the DOL's interpretation of the statute. The STAA prohibits employers from retaliating against an employee who refuses to drive because the employee has a reasonable apprehension of serious injury to the employee or the public due to hazardous weather conditions, provided that the employee notified the employer that the refusal to drive is because of current or forecasted weather conditions. *See* 49 U.S.C. § 31105(a)(2). The Court DENIES Old Dominion's Motion for Summary Judgment as to Bauer's claim under 49 U.S.C. § 31105(a)(1)(B)(ii). The Court also DENIES Bauer's partial motion for summary judgment on that claim.

## C. Punitive Damages

Old Dominion first argues that this Court should not consider Bauer's objections to the F&R on the issue of punitive damages on his federal law claims because those objections were filed one day after the 14-day period for filing objections had expired. Bauer's counsel explained that the omission in Bauer's brief of any discussion of federal punitive damages was inadvertent and the result of a formatting error. The supplemental objections were filed only one day late, and the Court considers that Old Dominion has suffered no prejudice from the fact that the supplemental objections were filed on December 28th rather than December 27th. Accordingly, the Court will consider Bauer's objections.

### 1. State Law Punitive Damages

The Magistrate Judge erroneously applied a "clear and convincing" evidentiary standard to Bauer's state law punitive damages claim. Oregon courts have explained that "the clear and convincing standard of proof 'relates to how a jury weighs the evidence, not to how a trial court assesses the capability of the evidence to establish facts." *Knepper v. Brown*, 213 Or. App. 598, 604 n.1 (2007); (quoting *Faber v. Asplundh Tree Expert Co.*, 106 Or. App. 601, 606 (1991)). Unless no reasonable jury could find "clear and convincing evidence that the party against whom

punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm," a punitive damages claim must go to the jury. *See Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or. App. 230, 237 (2008) *rev'd on other grounds* 347 Or. 526 (2011).

Old Dominion agrees that the Magistrate Judge should not have applied a clear and convincing standard at the summary judgment stage, but argues that Bauer has not presented sufficient evidence of malice or reckless and outrageous indifference on the part of Old Dominion that could allow a reasonable jury to award punitive damages. Old Dominion relies on an unpublished decision from the Ninth Circuit to support its argument that there is a higher burden on plaintiffs attempting to show punitive damages to meet the malice standard required under Oregon law. *See Hakanson-Black v. United Pac. Ins. Co.*, 865 F.2d 264 (table), 1988 WL 141206, at *5 (9th Cir. 1988). But that case, rather than supporting Old Dominion's position, articulates how Oregon courts have interpreted the punitive damages standard under state law. In that case, the Ninth Circuit explained that "Oregon's Supreme Court has 'uniformly sanctioned the recovery of punitive damages whenever there was evidence of a wrongful act done intentionally, with knowledge that it would cause harm to a particular person.'" *Id.* (quoting *McElwain v. Georgia-Pac. Corp.*, 245 Or. 247, 249 (1966)). In *McElwain*, the Oregon Supreme Court defined "malice" as "nothing more than a wrongful act done intentionally, without just cause or excuse." *McElwain*, 245 Or. at 249. In the pending case, a reasonable jury could find that Old Dominion acted intentionally when it terminated Bauer and that it did so knowing that losing his job would cause him harm. The Court concludes that Bauer has presented sufficient evidence that Old Dominion acted intentionally, with knowledge that its actions would cause harm, to allow a jury to weigh the evidence at trial under the clear and convincing standard. Old

Dominion's motion for summary judgment on Bauer's state law punitive damages claims is denied.

### 2. Federal Law Punitive Damages

The STAA authorizes punitive damages up to $250,000. 49 U.S.C. § 31105(b)(3)(C). The standard for punitive damages in STAA claims is the same as that for general federal punitive damages. *See Loftus v. Horizon Lines, Inc.*, Admin. Rev. Case No. 16-082, 2018 WL 2927676, at *9 (Admin. Rev. Bd. May 24, 2018) (applying federal punitive damages standard under *Smith v. Wade*, 461 U.S. 30, 51 (1983) to conduct that shows a "reckless or callous disregard for the plaintiff['s] rights, as well as intentional violations of federal law"). Punitive damages are appropriate under federal law when the defendant's conduct is particularly reprehensible, or when the defendant's "conduct . . . is outrageous, because of defendant's evil motive or his reckless indifference to the rights of others." *Kennedy v. Supreme Forest Prods., Inc.*, 295 F. Supp. 3d 113, 121 (D. Conn. 2017); *see State Farm Mut. Auto Ins. Co., v. Campbell*, 538 U.S. 408, 419 (2003). At trial, a jury will determine whether Old Dominion ordered Bauer to keep driving through the snowstorm in violation of federal safety regulations and despite the safety risk posed to Bauer and to the public. A jury could find that Old Dominion ordered Bauer to disregard the reasonable concern that he held for the safety of the public. If so, a reasonable jury could find that this demonstrated a reckless indifference to public safety.

Bauer does not allege that Old Dominion has a policy of egregious misconduct dating back 20 or 30 years, as there was in the *Kennedy* case, but there is no requirement that a defendant's alleged "greed and disregard for safety and the law" be "long-running" in order for punitive damages claims to go to the jury to decide. *Kennedy*, 295 F. Supp. 3d at 121. It is not for the court to weigh evidence of a defendant's "malice or . . . reckless indifference." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 540 (1999). That is a determination for the jury to make. As

such, Old Dominion's motion for summary judgment as to Bauer's federal punitive damages claims is denied.

## CONCLUSION

The Court ADOPTS Magistrate Judge Beckerman's Findings and Recommendation (ECF 136) in all respects except as to Bauer's claim under 49 U.S.C. § 31105(a)(1)(B)(ii) and Bauer's claims for punitive damages under state and federal law. On § 31105(a)(1)(B)(ii) claim, the Court DENIES Old Dominion's Motion for Summary Judgment. On Bauer's claims for punitive damages under state and federal law, the Court DENIES Old Dominion's motion for summary judgment. Old Dominion's Motion for Summary Judgment (ECF 97) is GRANTED in part and DENIED in part. Bauer's Motion for Partial Summary Judgment (ECF 114) is DENIED. Old Dominion's Motions to Strike (ECF 126 and 127) are sustained in part and overruled in part.

**IT IS SO ORDERED**.

DATED this 28th day of January, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge